IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                    CRIM. NO.: 25-338 (SCC)

AXEL LUGO VÉLEZ,

Defendant.

**OPINION AND ORDER**

Mr. Axel Lugo Vélez ("Mr. Lugo Vélez") stands charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Docket No. 1, pg. 1. Mr. Lugo Vélez now moves this Court to suppress certain incriminating statements made to law enforcement as violative of his Fifth Amendment rights. Docket No. 18, pg. 15. Specifically, he seeks the suppression of statements made during the execution of the search warrant, as well as those made during his interrogation at the police station after having asserted his rights via the Puerto Rico Police Bureau's ("PRPB") *Miranda* form. *Id.* at pgs. 8–14. The Government opposed the motion. *See* Docket No. 26. The Court held an evidentiary hearing on February 5, 2026, and ordered the

parties to file post-hearing briefs, s*ee* Docket No. 52, which were subsequently filed, *see* Docket Nos. 60, 61.  For the reasons set forth below, the Court **DENIES in part and GRANTS in part** Mr. Lugo Vélez's Motion to Suppress at Docket No. 18.

## I. FINDINGS OF FACT

During the evidentiary hearing, the Government presented the testimony of Officer Juan E. Quiñones Ramírez ("Officer Quiñones").  Mr. Lugo Vélez presented the testimony of Officer Luis Casiano Alvarado ("Officer Casiano").  Both officers are employed by the PRPB.

### a. Officer Quiñones

Officer Quiñones testified first for the Government. Docket No. 56, pg. 12.  Officer Quiñones testified that he has worked for the PRPB for 38 years and presently serves in the Ponce Criminal Intelligence Division.  *Id.* at pgs. 12–14.  On July 31, 2025, Officer Quiñones started his duty at 5:00 a.m., upon which he learned that he was assigned to the execution of a search and/or seizure warrant in Juana Díaz.  *Id.* at pgs. 14–15.  In his description of the search warrant execution, Officer Quiñones elaborated on the PRPB officers that accompanied him, the methods he took to verify the warrant, and the procedure with which the police identified and entered Mr. Lugo Vélez's home.  *Id.* at pgs. 15–17.

Once inside Mr. Lugo Vélez's home, Officer Quiñones identified himself, advised Mr. Lugo Vélez as to the reason for the police presence, and handed him the warrant. *Id.* at pg. 18. According to Officer Quiñones, at that moment, "[Mr. Lugo Vélez] said, out loud, that he did have a firearm in one of his rooms and the other person was there visiting on vacation and that he had nothing to do with that."[1] *Id*. at pg. 19. Officer Quiñones testified that he then "told [Mr. Lugo Vélez] verbally that he had no obligation to say anything but that whatever he did say could be used against him and read him his *Miranda* rights." *Id.*

Thereafter, the K-9 Unit entered and alerted to various places in the home. *Id*. at pg. 20. Officer Quiñones described the layout and decoration of the home, while explaining the procedure by which the police moved through the space. *Id.* at pgs. 20–22. Officer Quiñones' description matched the photographs entered into evidence by the Government. *See* Gov. Exs. 1–36.[2] Further, Officer Quiñones testified that while walking through the home, Mr. Lugo Vélez "[a]gain stated that the weapon was in the second bedroom." *Id*. at pg. 22. In

---

[1] The "other person" referenced is Mr. León, who is Mr. Lugo Vélez's nephew. Docket No. 56, pg. 23.

[2] These exhibits were discussed beforehand with defense counsel, who had no objection to their entering into evidence. *Id.* at pg. 25.

response, Officer Quiñones told him that "he didn't have to say anything, but anything he did say could be used against him and that he had a right to an attorney." *Id.*

Officer Quiñones and Mr. Lugo Vélez then proceeded to the second bedroom, where "[Mr. Lugo Vélez], himself, pointed out what [Officer Quiñones] would call a gray plastic box. There were several of them but [Mr. Lugo Vélez], himself, said the firearm was in that one." *Id.* Officer Quiñones once again "read to [Mr. Lugo Vélez] his rights." *Id*. The police then opened the plastic bin, within which they found a black purse containing a firearm, a round of ammunition, and magazines. *Id*. at pg. 23. At that moment, Officer Quiñones placed Mr. Lugo Vélez under arrest and verbally read him his *Miranda* rights. *Id.*

After the search was complete, Mr. Lugo Vélez and Mr. León were transported to the police station in Ponce. *Id.* at pg. 34. Once at the police station, they completed the documentation "that has to be filled out and corroborated with all detainees," to verify their names, addresses, social security numbers, and criminal records. *Id.* at pg. 35. Mr. Lugo Vélez also completed the PRPB *Miranda* form. *Id.* Officer Quiñones testified that he explained each line of the form to Mr. Lugo Vélez, had him initial next to each line and sign his name in full at the bottom of the form, and reminded

him "that this is not mandatory and it is only if [he] want[s] to." *Id.* at pgs. 35–36.

Thereafter, Mr. Lugo Vélez signed a Statement of Suspect form which stated: "I, [Mr.] Lugo Vélez… am responsible for the firearm which was found in the middle room of the house located at Serrano 794. My nephew, [Mr. León], was there on vacation and did not have access to the firearms that belonged to me." *Id.* at pg. 45. He also signed an Inventory of Seized Property form, which "describes the evidence seized in relation to the firearm, the serial number, caliber, the magazines in different sizes, the number of rounds of ammunition, [and] the black purse." *Id.* at pg. 40. Lastly, Mr. Lugo Vélez signed a "document on seized property that is attached to the search warrant that then goes to the District Court in Ponce directly to the Judge." *Id.*

### b. Officer Casiano

Next, Mr. Lugo Vélez called Officer Casiano as a witness. *Id.* at pg. 94. Officer Casiano has been employed by the PRPB for 30 years and is currently working in the Technical Services Division in Ponce. *Id.* In that position, he is tasked with taking photographs, measurements, and documenting evidence. *Id.* at pg. 95. Officer Casiano testified that his services were requested "during the morning hours" of July 31, 2025, where he was instructed to arrive at Mr. Lugo

Vélez's residence for the execution of the search warrant. *Id.*
Officer Casiano testified as to the procedure he followed to
photograph the events of that morning. *Id.* at pg. 96.
Specifically, Officer Casiano testified that he first took photos
of the exterior of the residence and the search warrant. *Id*. He
then took photographs of the interior of the home before the
warrant was executed. *Id.* at pg. 109. He then exited the
residence and returned when the K-9 marked the firearm
evidence, which he photographed. *Id*. He then, again, exited
the residence and returned once the search was complete to
"take photographs of the house as the way [the PRPB officers]
left it." *Id.* at pg. 104. Officer Casiano also testified that "[a]t
no time, when [he] took the[] 76 photographs" for this case,
did he hear Officer Quiñones read Mr. Lugo Vélez his *Miranda*
warnings, nor did he hear Mr. Lugo Vélez's admission as to
the ownership of the gun. *Id.* at pgs. 105–06.

### c. Mr. Lugo Vélez

Although Mr. Lugo Vélez did not testify at the
evidentiary hearing, he did provide a declaration under
penalty of perjury in support of his request to suppress his
statements. *See* Docket No. 33-1. There, Mr. Lugo Vélez
declares that he was never given verbal *Miranda* warnings
while inside his home, nor did he make any admission while
in the home as to the ownership of the firearm. *Id.* at pgs. 1–

2.  Rather, he states that the first, and only, time he was given *Miranda* warnings was at the police station pursuant to the written form.  *Id.* at pg. 1.  After signing the form, Mr. Lugo Vélez declares that the "police told [him] they would go to the public housing project, find [his] daughter, and take her to the Department of Family if [he] did not accept responsibility for the firearm."  *Id.* at pg. 2.  Mr. Lugo Vélez claims that the "[p]olice also threatened to prosecute [his] nephew."  *Id.*  As Mr. Lugo Vélez felt "pressured and fearful of police retaliation," he decided to sign the written statement and property inventory forms.  *Id.*

## II.  ANALYSIS

### a.  Statements Made During the Execution of the Search Warrant

Mr. Lugo Vélez argues that his statements to the police should be suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Under *Miranda*, warnings "must be given before 'a person is questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way.'"  *United States v. Simpkins*, 978 F.3d 1, 9 (1st Cir. 2020) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).  "Absent such warnings, most statements that officers obtain during a custodial interrogation are inadmissible at trial."

*United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020). Thus, for the challenged admissions to be suppressed, Mr. Lugo Vélez must have been in custody and interrogated without having received his *Miranda* warnings. *United States v. McCarty*, 475 F.3d 39, 45 (1st Cir. 2007).

Mr. Lugo Vélez made the statements that he now seeks to suppress while handcuffed. Docket No. 56, pgs. 23–24 ("During the process, when we were there [in the home], yes, [Mr. Lugo Vélez and Mr. León] were handcuffed."). As such, there can be no question that Mr. Lugo Vélez made said statements while in custody. *McCarty*, 475 F.3d at 45–46 ("In order to determine whether [Mr. Lugo Vélez] was in custody, we look to see if 'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983))). Thus, the issue is whether Mr. Lugo Vélez's admissions were made voluntarily or, rather, were the result of an interrogation. *Id.* at 45. An interrogation occurs where "there is 'express questioning…or any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The narrative before the Court, based on Officer

Quiñones' testimony, is the following: upon receipt of the search warrant, Mr. Lugo Vélez voluntarily expressed his ownership of the firearm and disavowed Mr. León's involvement; Officer Quiñones then advised Mr. Lugo Vélez of his *Miranda* rights; thereafter, as the search was being executed, Mr. Lugo Vélez again expressed his ownership of the firearm, with Officer Quiñones advising him of his rights a second time; then, upon entering the second bedroom, Mr. Lugo Vélez pointed to a gray bin and indicated that the firearm was located within it, prompting Officer Quiñones to advise him of his rights for a third time.  Docket No. 56, pgs. 19–23.  To note, throughout the evidentiary hearing, Officer Quiñones repeatedly testified that "all of [Mr. Lugo Vélez's statements were made voluntarily.  At no point in time was he being interrogated." *Id.* at pg. 25.  Mr. Lugo Vélez challenges the credibility of Officer Quiñones' testimony.  Specifically, Mr. Lugo Vélez posits that "Quiñones' testimony is unreliable and incredible given his material omissions in the incident report, his inconsistent statements to federal agents, and [Officer] Casiano's testimony refuting key elements of Quiñones' testimony that were also omitted from his incident report." Docket No. 60, pg. 7.  Each challenge will be addressed in turn.

First, Mr. Lugo Vélez's challenge as to the incident

report is, in essence, an attempt at impeachment by omission. Impeachment by omission occurs "when a party seeks to impeach a witness's trial testimony through evidence of their 'previous failure to state a fact in circumstances in which that fact naturally would have been asserted.'" *United States v. Villa-Guillen*, 102 F.4th 508, 524 (1st Cir. 2024) (citing *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980)). In this instance, Mr. Lugo Vélez contends that the incident report fails to make any "mention of Mr. Lugo [Vélez] making any incriminating statements regarding the presence of a firearm in the home," as well as to include the specific times when the verbal *Miranda* warnings were given. Docket No. 60, pg. 4. According to Mr. Lugo Vélez, these are "material omission[s] that damage[] [Officer] Quiñones' hearing testimony." *Id.* at pgs. 4–5. The Court disagrees.

During the hearing, Officer Quiñones explained that the incident report provided a simple summary of the incident, which included what he subjectively considered to be the most important details. Docket No. 56, pgs. 67–68 ("[T]his is a report that is for statistical purposes and it gathers the most important information according to me, as a police officer. It may not be what is considered the most important by another person."). Further, when questioned about these specific omissions during his cross examination, Officer

Quiñones provided clear and consistent reasoning for his decision: "Q: So it's not important to you to note the time of the *Miranda* warnings? A: The specific moment or place, to me, that is not important. What is important for me is that the person know[s] that they are protected by some legal rights and, because it is a narrative report, I include that in my report like in general terms, not specifically." *Id.* at pg. 68. Although one might criticize the brevity of the report in retrospect, which uses less than 30 lines of text to describe an incident spanning several hours, counsels for Mr. Lugo Vélez did not marshal any evidence to refute Officer Quiñones' discretionary power in this context. Given that the incident report does not contradict Officer Quiñones' testimony, and a satisfactory explanation has been provided as to the challenged omissions, the Court concludes that the incident report does not undermine the reliability of Officer Quiñones' testimony.

Second, Mr. Lugo Vélez claims that Officer Quiñones "told investigator Fabio Rodríguez" that he asked Mr. Lugo Vélez whether he had any firearms in the home before reading him his *Miranda* warnings. Docket No. 60, pgs. 2–3 (referencing the Report of Investigation prepared by the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF Report"), which is tendered at Docket No. 27-1). Mr.

Lugo Vélez posits that the Government represented the same in its opposition to the motion to suppress. *Id.* (referencing Docket No. 26, pg. 4). Boiled down, although Mr. Lugo Vélez's overarching position is that he "did not make any incriminating admissions" during the search, for the purposes of this argument, he appears to imply that any such admission would have been made in response to a question from Officer Quiñones, rather than a voluntary, spontaneous statement. *Id.* at pgs. 2–3, 6.

At the evidentiary hearing, defense counsel began a line of questioning related to the ATF Report. Docket No. 56, pgs. 56–59. As one example, defense counsel asked Officer Quiñones the following: "Isn't it true that you told [the prosecutor] that, after you presented the search warrant, you asked Mr. Lugo [Vélez] if there were any firearms?" Docket No. 56, pg. 56. To which, Officer Quiñones replied: "No, I did not ask that. He said that voluntarily." *Id.* However, after a brief sidebar, defense counsel abandoned the line of questioning.[3] *See id.* at pg. 60. As such, the Court finds that

---

[3] The parties approached the bench to clarify the foundation of the line of questioning. *See* Docket No. 56, pg. 59. Defense counsel expressed that it was "trying to find out where [the statement that Officer Quiñones asked Mr. Lugo Vélez if he had a gun] came from because [it] didn't know if this was directly from him." *Id.* The Government explained that it came from the ATF Report, which was not prepared by Officer Quiñones, and that "the Government based that particular portion of the opposition on [the

insufficient foundation has been laid to rely on the ATF Report. Importantly, Favio Rodríguez, who prepared the ATF Report, and Miguel Sepúlveda, who authorized it, did not testify at the hearing. Docket No. 27-1; *see also* Docket No. 56, pg. 2. Further, during the brief line of questioning noted, Officer Quiñones consistently asserted that he did not prompt or question Mr. Lugo Vélez at any time, and that all admissions were made voluntarily. *Id.* at pgs. 56–58. As a result, the Court concludes that the ATF Report and the Government's Opposition do not offset the reliability of Officer Quiñones' testimony.

Lastly, Mr. Lugo Vélez asserts that Officer Quiñones' testimony was contradicted by Officer Casiano's testimony. Firstly, Mr. Lugo Vélez notes that Officer Casiano, "a veteran police officer who has worked in the PRPB for over 30 years in units such as homicide[,] testified that he never referred to a police incident report as a 'statistical report,'" as Officer Quiñones did. Docket No. 60, pg. 7; *see also* Docket No. 56, pg. 108. However, Mr. Lugo Vélez fails to establish that Officer Casiano's approach is a standardized practice within the PRPB. Moreover, and more importantly, Mr. Lugo Vélez fails to explain why the naming convention is material to this

---

ATF Report], not on a particular statement [made by Officer Quiñones]." *Id.*

issue. If, for example, Officer Casiano had testified that it was a mandatory practice within the PRPB to include the specific time in which an arrestee received his *Miranda* warnings in the Incident Report, then Mr. Lugo Vélez might have been on stronger footing. As that is not the case, the Court does not conclude that Officer Casiano's testimony as to the incident report's naming convention undermines the reliability of Officer Quiñones' testimony.

Additionally, Mr. Lugo Vélez emphasizes that despite Officer Casiano having been "'quite close, and 'within earshot,'" during the challenged events, he "never heard Mr. Lugo [Vélez] say anything about a firearm being present in the home," nor did he hear "Quiñones nor any other police officer read Mr. Lugo *Miranda* warnings." Docket No. 60, pg. 7. However, as the Government noted during the evidentiary hearing, Mr. Lugo Vélez failed to establish that Officer Casiano was present during the execution of the search warrant such that he would have been able to hear the challenged statements. Docket No. 56, pgs. 109–110. As such, again, the Court cannot conclude, as Mr. Lugo Vélez wishes, that Officer Casiano's testimony contradicts Officer Quiñones' testimony.

In sum, based on Officer Quiñones' clear and credible testimony and Mr. Lugo Vélez's failure to marshal evidence

to the contrary, the Court finds that Mr. Lugo Vélez's statements during the execution of the search warrant were made voluntarily, and thus there was no *Miranda* violation. Accordingly, the Court will not suppress the challenged admissions.

### b.  Statements Made at the Police Station

Mr. Lugo Vélez also contends that his admissions at the Ponce police station, both verbal and written, should be suppressed because they were obtained in violation of his rights under *Miranda*.  Docket No. 160, pgs. 8–14.  To reiterate, for the challenged admissions to be suppressed, Mr. Lugo Vélez must have been in custody and interrogated without having received his *Miranda* warnings.  *McCarty*, 475 F.3d at 45.  Given that Mr. Lugo Vélez was under formal arrest, the custody element is clearly satisfied.  *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996).  Thus, Mr. Lugo Vélez's argument, and in turn, the Court's analysis, is again centered on the interrogation element.

Mr. Lugo Vélez's contends that his invocation of his Fifth Amendment right to counsel on the PRPB *Miranda* form, "should have precluded subsequent police questioning or its equivalent."  Docket No. 60, pg. 8.  However, Mr. Lugo Vélez posits that the police "failed to scrupulously honor [his] request to remain silent under the factors articulated in *United*

*States v. Lugo Guerrero*, 524 F.3d 5 (1st Cir. 2008)." *Id.* at pg. 12. As such, he moves this Court to suppress "all his incriminating and written statements [made] after [his] invocation at 7:00 am on the day of his arrest."[4] *Id.* In opposition, the Government emphasizes that Officer Quiñones did not ask Mr. Lugo Vélez any incriminating questions after signing the PRPB *Miranda* form. Docket No. 61, pg. 4. Rather, after Mr. Lugo Vélez signed the form, Officer Quiñones indicated to him "that he would be consulting the case with the prosecutor, who would ultimately decide how to proceed. At which point [Mr. Lugo Vélez], once more, took responsibility for the firearm seized." *Id.* at pg. 3. Based on that "voluntary admission," says the Government, Officer Quiñones "gave [Mr. Lugo Vélez] a suspect statement form, in which he wrote down that he had full responsibility for the firearm." *Id.*

"If the suspect invokes his right to counsel at any point during the interrogation, all questioning must cease either until an attorney is present or until the suspect initiates

_____

[4] Mr. Lugo Vélez signed the PRPB *Miranda* form at 7:00 am on the day of his arrest, as substantiated by the form's official time stamp and Officer Quiñones' testimony. *See* Gov. Ex. 40-A; *see also* Docket No. 56, pg. 37. Thereafter, Mr. Lugo Vélez signed three additional forms: the Statement of Suspect, Proof of Service and Inventory, and Inventory of Seized Property. Gov. Exs. 37-A, 38-A, 39-A.

further communication with the officers."  *Carpentino*, 948 F.3d at 20 (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)).  The same is true whether the defendant invokes his rights verbally or in written form.[5]  *See United States v. Fernández*, 716 F. Supp. 3d 8, 20 (D.P.R. 2024).  In such a circumstance, the "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *United States v. Thongsophaporn*, 503 F.3d 51, 56 (1st Cir. 2007) (quoting *Mosley*, 423 U.S. at 104.) In making that determination, the Court must consider four factors, as established in *Mosley*: "(1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect."  *Lugo*

---

[5] Prior decisions in this District have made clear that a defendant may "invoke[] his Fifth Amendment rights to counsel and to remain silent [through] the PRDP *Miranda* waiver form." *United States v. Fernández*, 716 F. Supp. 3d 8, 20 (D.P.R. 2024); *see also United States v. Ortíz-Ortíz*, No. 21-192, 2024 WL 621305, at *4–6 (D.P.R. Feb. 14, 2024).

*Guerrero,* 524 F.3d at 12 (citing *Mosley,* 423 U.S. at 104–06).  The Court shall also consider the "totality of the circumstances." *United States v. Barone,* 968 F.2d 1378, 1384 (1st Cir. 1992).

Here, it is undisputed that Mr. Lugo Vélez signed the PRPB *Miranda* form indicating that he was unwilling to waive his rights at 7:00 am.  *See* Gov. Ex. 40-A.  Officer Quiñones testified that he understood Mr. Lugo Vélez's refusal.  Docket No. 56, pg. 38 ("Q: Upon him making that selection that you, yourself, marked [on the PRPB *Miranda* form], what did you understand that to mean? A: That [Mr. Lugo Vélez] was not willing to waive his *Miranda* rights and, in fact, he had been informed about these and he understood them.").  At that moment, Officer Quiñones was obligated to cease all questioning entirely.  *Carpentino*, 948 F.3d at 20 ("[T]he defendant invoked his right to counsel during the first phase of the custodial interview and [] the troopers, as required, *immediately* ended the interview.") (emphasis added)).  Officer Quiñones testified that he was aware of this obligation.  *See* Docket No. 56, pg. 51 ("Q: You are aware that when a suspect asks for counsel, all questioning must stop. A: Correct.").  Nonetheless, Officer Quiñones proceeded to give Mr. Lugo Vélez three incriminating documents to complete and sign, which occurred without the presence of an attorney. *Id.* at pg. 44.

The Government posits that no interrogation occurred here, as Officer Quiñones did not ask Mr. Lugo Vélez any questions.  Docket No. 161, pg. 4.  However, interrogation is not limited to verbal interactions, but also includes actions that are designed to elicit an incriminating response.  *See United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002) ("For *Miranda* purposes, interrogation is 'express questioning or its functional equivalent.'" (quoting *Innis,* 446 U.S. at 300–01)).  Further, the Government appears to imply that Mr. Lugo Vélez initiated subsequent discussions by "voluntary[ily] admi[tting]" to his ownership of the firearm, such that questioning could resume.  Docket No. 161, pg. 3; *see also Thongsophaporn*, 503 F.3d at 56 ("[L]aw enforcement may resume questioning a defendant in custody who has exercised his right to remain silent if the defendant subsequently initiates further discussions about the investigation.").  However, by the Government's own recount, Mr. Lugo Vélez's admission occurred only *after* Officer Quiñones advised him of his intent to speak to the prosecutor.[6]  Docket

---

[6] Specifically, Officer Quiñones testified: "I indicated to him, I gave him guidance, as far as the investigating process that I was getting ready to call the prosecutor on duty to inform him of the events.  At that moment, again, [Mr. Lugo Vélez] said the firearm was his and the other person had nothing to do with that.  I said, 'Look, there is a form where you could state what you just said.  And I can provide that document to the prosecutor who will be the person who takes the initiative about the steps

No. 161, pg. 3.  As such, the Court does not understand that Mr. Lugo *"himself* initiate[d] further communication, exchanges, or conversations with the police," *Edwards*, 451 U.S. at 485 (emphasis added), far less did he do so "without coercion or probing."  *See United States v. Montgomery*, 714 F.2d 201, 204 (1st Cir. 1983); *see, in contrast, Carpentino*, 948 F.3d at 23 ("[T]he defendant initiated investigation-related communication with the troopers when he asked to speak with them and proceeded to inquire about the maximum sentence for the crime.").

In sum, the Court considers Officer Quiñones' comments about speaking to the prosecutor and delivery of the Suspect Statement Form to have been designed to elicit an incriminating response—namely, to encourage Mr. Lugo Vélez to take responsibility for the firearm—thus constituting interrogation.  *Genao*, 281 F.3d at 310.  Moreover, pursuant to *Mosley*, the Court notes that: only thirty minutes passed between Mr. Lugo Vélez's invocation of his rights through the PRPB *Miranda* form and the drafting of the Suspect Statement Form, *see* Gov. Exs. 40-A, 37-A; Officer Quiñones administered the PRPB *Miranda* form and the subsequent three forms, *see* Gov. Exs. 37-A, 38-A, 39-A, 40-A; Officer

---

to be followed.'"  Docket No. 56, pg. 80.

Quiñones did not provide Mr. Lugo Vélez with a fresh set of *Miranda* warnings, *see* Docket No. 56, pg. 84 ("Q: You did not give him refreshed warnings. A: No, I had already informed him of those verbally and in writing."); and the three subsequent forms concerned criminal responsibility for the firearm, *see* Gov. Exs. 37-A, 38-A, 39-A. *Lugo Guerrero*, 524 F.3d at 12 (citing *Mosley*, 423 U.S. at 104–06). Accordingly, as Mr. Lugo Vélez's "'right to cut off questioning' was [not] 'scrupulously honored,'" *Mosley*, 423 U.S. at 104, the Court concludes that the forms and statements occurring after 7:00 a.m. at the Ponce police station were obtained in violation of *Miranda*, and as such, are inadmissible.

## I. CONCLUSION

In light of the above, Mr. Lugo Vélez's Motion at Docket No. 18 is **DENIED in part and GRANTED in part.**

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 8th day of May 2026.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE